# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

DANIEL ORMROD,

     Plaintiff,

vs.                                                                                          No. CIV 17-0706 JB/KK

HUBBARD BROADCASTING, INC.,
d/b/a KOB 4 and KOB-TV, LLC,

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Motion to Dismiss Defendant KOB-TV, LLC's Counterclaim for Promissory Estoppel and Breach of Contract, filed May 21, 2018 (Doc. 77)("Motion"). The Court held a hearing on June 28, 2018. The primary issues are: (i) whether Plaintiff Daniel Ormrod's demand that, if Defendant KOB-TV, LLC ("KOB 4") did not remove an allegedly defamatory news article from its website, then Ormrod would sue gave rise to a contractual obligation not to sue KOB 4; and (ii) whether the same demand also gave rise -- under the promissory estoppel doctrine -- to an enforceable promise not to sue KOB 4. The Court concludes that: (i) Ormrod's demand did not create a contract, so he did not incur a contractual obligation not to sue KOB 4; and (ii) Ormrod's demand was not a promise, so no legally enforceable promise not to sue exists. Accordingly, the Court will grant the Motion.

## FACTUAL BACKGROUND

The Court draws its facts from KOB-TV, LLC's Answer, Defenses, and Counterclaim ¶¶ 1-29, at 8-13, filed April 30, 2018 (Doc. 66)("Counterclaim"). The Court accepts KOB 4's factual allegations as true for the limited purpose of deciding the Motion. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(clarifying the "tenet that a court must accept as true all of the [factual]

allegations contained in a complaint")(alteration added)(citing <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)); <u>Archuleta v. Wagner</u>, 523 F.3d 1278, 1283 (10th Cir. 2008)(concluding that a court must "accept as true all well-pleaded facts, as distinguished from conclusory allegations" when deciding a motion to dismiss).

KOB 4 is a Delaware limited liability company whose sole member is Hubbard Broadcasting, Inc., a Minnesota corporation with its principal place of business in Minnesota. <u>See</u> Counterclaim ¶ 1, at 8. Ormrod is a citizen of New Mexico. <u>See</u> Counterclaim ¶ 2, at 8. The amount in controversy in this case exceeds $75,000.00. <u>See</u> Counterclaim ¶ 4, at 9.

On May 12, 2016, KOB 4 learned of a child abuse allegation involving Ormrod, a teacher at Dennis Chavez Elementary School in Albuquerque, New Mexico. <u>See</u> Counterclaim ¶ 6, at 9. Specifically, KOB 4 received a police report describing "the alleged completed commission of felony child abuse by Ormrod." Counterclaim ¶ 7, at 9. Allegedly, Ormrod grabbed a student's arm, leaving multiple bruises. <u>See</u> Counterclaim ¶ 8, at 9. KOB 4 published an online news article saying that Ormrod had been charged with felony child abuse. <u>See</u> Counterclaim ¶¶ 7, 9, at 9-10.

At approximately 3:56 p.m., Ormrod's attorney, Sam Bregman, called KOB 4, and said that he represented Ormrod and that Ormrod had not been charged. <u>See</u> Counterclaim ¶ 12, at 10. Bregman said that if KOB 4 did not remove the article, he would sue. <u>See</u> Counterclaim ¶ 12, at 10. After confirming with an Albuquerque Public Schools employee that Ormrod had not been charged, KOB 4 "at approximately 4:02 PM . . . updated the article to remove the 'charged' language, and at approximately 4:08 PM . . . removed Ormrod's name from the article." Counterclaim ¶ 14, at 11. KOB 4 also added an editor's note stating "'[t]he name of the teacher being investigated has been removed as he does not currently face charges. APS has since

clarified that there is only an investigation at this point. A letter home to parents named the teacher involved.'" Counterclaim ¶ 14, at 11 (quoting Article at 3, filed April 30, 2018 (Doc. 66-6)). Ormrod subsequently sued KOB 4. See Counterclaim ¶ 15, at 11.

## PROCEDURAL BACKGROUND

Ormrod alleges a single count of defamation against KOB 4. See Amended Complaint for Defamation ¶¶ 22-30, at 3-4, filed March 20, 2018 (Doc. 42). KOB 4 later filed two counterclaims against Ormrod, alleging one count of promissory estoppel and one count of breach of contract. See Counterclaim ¶¶ 16-29, at 11-13. Ormrod subsequently filed the Motion. See Motion at 1.

### 1.    The Motion.

Ormrod moves the Court to dismiss the two counterclaims. See Motion at 1. Ormrod first argues that KOB 4 "does not state that Plaintiff explicitly stated he would not file a lawsuit even if the defamatory story was taken down." Motion at 3. According to Ormrod, "[i]t is not uncommon for an attorney, representing a client, to make a demand upon an opposing party to cease and desist from a certain action. The demand described under the auspices of [KOB 4's] counterclaim is insufficient to establish a contract." Motion at 3. He also contends that KOB 4 has not stated a claim for breach of contract, "because it does not state there was any sufficient consideration to establish a contract or the specificity required under Hansen v. Ford Motor Co.," 1995-NMSC-044, 900 P.2d 952. Motion at 4.

Ormrod then asserts that KOB 4 has not pled facts sufficient to satisfy promissory estoppel's elements. See Motion at 3-4 (citing Eavenson v. Lewis Means, Inc., 1986-NMSC-097, 730 P.2d 464). Finally, Ormrod contends that the Counterclaim "fails to state whether the individual who spoke to Plaintiff's counsel possessed the legal authority to enter into a

settlement and release agreement on its behalf." Motion at 4. Ormrod concludes that the Court should grant the Motion. See Motion at 4.

**2. The Response.**

KOB 4 responds to the Motion. See KOB-TV, LLC's Response to Plaintiff Daniel Ormrod's Motion to Dismiss Defendant KOB-TV, LLC's Counterclaim for Promissory Estoppel and Breach of Contract, filed June 4, 2018 (Doc. 81)("Response"). KOB 4 first contends that it has sufficiently pled a claim for breach of a unilateral contract. See Response at 5. According to KOB 4, a unilateral contract exists between itself and Ormrod, because Ormrod made an offer not to sue KOB 4 in exchange for KOB 4 removing from its website the news article, and KOB 4 accepted Ormrod's offer by removing the relevant language. See Response at 6. KOB 4 adds that "an agreement to forebear suit is sufficient consideration in a unilateral contract." Response at 8.

KOB 4 next argues that Ormrod breached the parties' alleged contract. See Response at 10. According to KOB 4, "despite accepting Ormrod's offer by removing the 'charged' language, Ormrod has proceeded to sue KOB-TV, causing KOB-TV unnecessary harm." Response at 11. According to KOB 4, "Ormrod had a duty not to sue KOB-TV. However, Ormrod breached his contractual obligation by filing his lawsuit against KOB-TV." Response at 11.

KOB 4 then contends that Ormrod's breach of the parties' alleged contract caused KOB 4 damages. See Response at 11. According to KOB 4, "but for Ormrod filing his suit against KOB-TV, KOB-TV would not be damaged." Response at 11. Further, according to KOB 4, "as a result of Ormrod's breach, KOB-TV has suffered damages, including but not limited to, the

attorneys' fees and costs of defending against the suit by Ormrod." Response at 12.  KOB 4 concludes that it has properly pled a breach of contract claim.  See Response at 12.

Turning to its promissory estoppel claim, KOB 4 asserts that it has properly pled all of that claim's elements.  See Response at 12.  First, KOB 4 avers that Ormrod made a promise inducing an action by promising not to sue if KOB 4 removed language from its news article.  See Response at 14.  According to KOB 4, "induced by that promise, KOB-TV took the action of removing the language . . . from the news article."  Response at 15.  Second, KOB 4 contends that it reasonably relied on Ormrod's promise.  See Response at 16.  According to KOB 4, it "took the action of removing the language based on the promise by Ormrod and . . . the action was in direct response to Ormrod's promise not to sue if the language was removed."  Response at 16.  Third, KOB 4 contends that it substantially changed its position by updating its news article and removing the "charged" language.  Response at 17.  Fourth, KOB 4 avers that it "has sufficiently pleaded foreseeability, noting that Mr. Bregman, on behalf of Ormrod, made a promise to induce KOB-TV to take a certain action."  Response at 17.  Finally, KOB 4 contends that "the [e]nforcement of the promise is necessary to prevent injustice to KOB-TV, including its expense of its continued defense of Ormrod's lawsuit."  Response at 18.  KOB 4 concludes that the Court should deny the Motion.  See Response at 18.

**3.     The Reply.**

Ormrod replies to the Response.  See Plaintiff's Reply in Support of his Motion to Dismiss Defendant KOB-TV, LLC's Counterclaim for Promissory Estoppel and Breach of Contract, filed June 21, 2018 (Doc. 88)("Reply").  Ormrod first contends that "the language plead by KOB in its Counterclaim falls short of creating a contract."  Reply at 1.  According to Ormrod, "there is simply no legal precedent to support KOB's contention where a potentially

defamed individual calls a newsroom complaining about an error in a story, convinces the news media entity to remove the story, then somehow claim[s] an unwritten contract was created to forego litigation." Reply at 2. Ormrod continues that "there is nothing in the words plead[ed] in the counterclaim which explicitly state take down the false story and my client will not sue you if you do." Reply at 3. According to Ormrod, KOB's characterization of his statement as a "'promise not to sue' is simply self-serving commentary on the actual statement which KOB claims created the contract." Reply at 3 (quoting Counterclaim ¶13, at 10).

Ormrod next avers that KOB 4's promissory estoppel claim should fail, because "KOB does not plead anything in its counterclaim to substantiate a change in position." Reply at 5. According to Ormrod, "all [KOB 4] appeared to do was remove the false claim that Plaintiff was charged with a felony. The story was not removed and [KOB 4] does not claim with any substance to have suffered a change in position by simply correcting a story." Reply at 5. Ormrod concludes that the Court should dismiss KOB 4's counterclaims. <u>See</u> Reply at 6.

**4.      The Hearing.**

The Court held a hearing on June 28, 2018. <u>See</u> Draft Transcript of Motion Hearing at 1:6-9 (taken June 28, 2018)("Tr.")(Court).[1] Ormrod first argued that the language "[r]emove from [KOB.com] within 10 minutes the article containing the statement that Ormrod had been charged or Ormrod would sue KOB-TV" does not create a contract. Tr. at 3:18-25 (Bregman). According to Ormrod, "I promised to them that I would sue them unless they did something. I didn't promise that I would never sue them." Tr. at 3:25-4:3 (Bregman). Ormrod continued that "[n]owhere did they allege that I said . . . I promise not to sue you if you do this." Tr. at 4:13-15 (Bregman).

---

[1]The Court's citations to the hearings' transcript refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

KOB 4 responded that Ormrod's words created a unilateral contract, because "[t]he language is important, it isn't take this down and I will sue you. It's take this down or I will sue you," Tr. at 9:6-8 (Rogers), and "what you're hearing now is, well, let's transform that ['or'] into an 'and,'" Tr. at 10:12-13 (Rogers). Ormrod replied that "there is no way that you can say positively to someone do something or I'm going to sue you and then say that that is somehow a promise that that same person would never sue that person. That is just contrary to what . . . makes logical sense." Tr. at 19:22-20:2 (Bregman).

Turning to promissory estoppel, Ormrod averred that essentially the same analysis applies regarding whether he made a promise not to sue. <u>See</u> Tr. at 23:17-21 (Bregman). The Court then asked KOB 4 about promissory estoppel's fifth element, requiring a promise's enforcement to prevent injustice. <u>See</u> Tr. at 24:18-20 (Court). The Court stated: "I'm not seeing the injustice to channel 4. If anything, it mitigated damages here by getting . . . the demand from an attorney and then acting on it." Tr. at 25:10-13 (Court). KOB 4 responded that "I believe that the injustice, the Court can take judicial notice of the expense and the aggravation and the damage to everyone involved here. A proceeding that's going to be expensive." Tr. at 27:5-8 (Rogers). At the hearing's conclusion, the Court stated that it was inclined to grant the Motion. <u>See</u> Tr. at 35:8-9 (Court).

## **LAW REGARDING RULE(12)(b)(6)**

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." <u>Mobley v. McCormick</u>, 40 F.3d 337, 340 (10th Cir. 1994). A complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must

accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the claimant's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(quoting Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.  Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is

insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). The United States Court of Appeals for the Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(internal citations omitted). See Glover v. Gartman, 899 F. Supp. 2d 1115, 1131 (D.N.M. 2012)(Browning, J.); Tavasci v. Cambron, No. CIV 16-0461, 2017 WL 3173011, at *14 (D.N.M. 2017)(Browning, J.).

## LAW REGARDING DIVERSITY JURISDICTION AND ERIE

Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938)("Erie"), a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007). Accord Mem. Hosp. v. Healthcare Realty Trust Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.). "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an Erie prediction should look first to the words of the state supreme court." Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M.

2015)(Browning, J.).[2]  If the Court finds only an opinion from the Court of Appeals of New

Mexico, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in

making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same

way that it would be bound by a Supreme Court decision."  Mosley v. Titus, 762 F. Supp. 2d

1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that, where the only opinion on point is "from

the Court of Appeals, [] the Court's task, as a federal district court sitting in this district, is to

predict what the Supreme Court of New Mexico would do if the case were presented to

it")(citing Wade v. EMCASCO Ins. Co., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that,

"[w]here no controlling state decision exists, the federal court must attempt to predict what the

state's highest court would do," and that, "[i]n doing so, it may seek guidance from decisions

---

[2]In performing its Erie-mandated duty to predict what a state supreme court would do if
faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may
sometimes contradict the state supreme court's own precedent if the federal court concludes that
the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson
Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M.
2014)(Browning, J.).  Courts should, obviously, be reticent to formulate an Erie prediction that
conflicts with state court precedent; even if the prediction turns out to be correct; such
predictions produce disparate results between cases filed in state and federal courts, as the old
state supreme court precedent usually binds state trial courts.  The factors to which a federal
court should look before making an Erie prediction that a state supreme court will overrule its
prior precedent vary depending upon the case, but some consistent ones include: (i) the age of
the state supreme court decision from which the federal court is considering departing -- the
younger the state case is, the less likely it is that departure is warranted; (ii) the amount of
doctrinal reliance that the state courts -- especially the state supreme court -- have placed on the
state decision from which the federal court is considering departing; (iii) apparent shifts away
from the doctrine that the state decision articulates, especially if the state supreme court has
explicitly called an older case's holding into question; (iv) changes in the composition of the
state supreme court, especially if mostly dissenting justices from the earlier state decision remain
on the court; and (v) the decision's patent illogic or its inapplicability to modern times.  See Peña
v. Greffet, 110 F. Supp. 3d at 1132 n.17.  In short, a state supreme court case that a federal court
Erie predicts that the state court would overrule is likely to be very old, neglected in subsequent
state court cases -- perhaps because it is in a dusty corner of the common law which does not get
much attention or have much application -- and clearly wrong.

rendered by lower courts in the relevant state")).[3]   The Court may also rely on Tenth Circuit

---

[3]The Supreme Court of the United States has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day. It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

> . . . .

> We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

> . . . .

> The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Trust Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted). The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See

decisions interpreting New Mexico law. See Anderson Living Trust v. WPX Energy Prod.,

LLC, 27 F. Supp. 3d at 1243 & n.30.[4]  Ultimately, "the Court's task is to predict what the state

---

17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Moore's")("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions.")(emphasis and title case omitted).

[4]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges.  If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes a state's law has undergone in the ensuing years, then parties litigating state law claims will be subject to a different body of substantive law, depending whether they litigate in state court or federal court.  This result frustrates the purpose of Erie, which held that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent result regardless of the forum.  This consideration pulls the Court toward according Tenth Circuit precedent less weight and according state court decisions issued in the ensuing years more weight.  On the other hand, when the state law is unclear, it is desirable for there to be at least uniformity among federal judges as to its proper interpretation.  Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law.  This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law -- at least provides consistency at the federal level, so long as federal district judges must follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the state's highest court, on one end, and independently interpreting the state law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other.  In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges.  Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system.  More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal.  All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would.  Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency.  When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that

interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' decisions are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. Accordingly, Tenth Circuit precedent can lag behind state law developments -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one state. It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state than it is for the Tenth Circuit to monitor separate legal developments in eight states. The Tenth Circuit used to follow this rationale in applying a clearly erroneous standard of review to district judge decisions of state law with no controlling state Supreme Court precedent. See Weiss v. United States, 787 F.2d 518, 525 (10th Cir. 1986); Rawson v. Sears, Roebuck, & Co., 822 F.2d 908, 923 (10th Cir. 1987)(McKay, J., dissenting)(collecting cases). Since the mid-1980s, however, the Tenth Circuit has abandoned that rationale and applied a de novo standard of review to district judge decisions applying state law with no governing state supreme court precedent. See Rawson v. Sears, Roebuck, & Co., 822 F.2d at 908. See also id. at 923 (McKay, J., dissenting)(noting that the majority had abandoned the "sanctified" clearly erroneous standard or the "so-called local-judge rule" in its analysis). The Court regrets the Tenth Circuit's retreat from the clearly erroneous standard.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess. A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on state court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that x is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is x. Its holdings are descriptive, not prescriptive -- interpretive, not normative. Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of

law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of state law is at tension with <u>Erie</u>, giving independent substantive effect to federal judicial decisions -- <u>i.e.</u>, applying federal law -- in a case brought in diversity.

 <u>Erie</u>'s purpose is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." <u>Moore's</u> § 124.22[3] (citing <u>Comm'r v. Estate of Bosch</u>, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.")(citation and internal quotation marks omitted). This formulation may not be the most precise if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that state circuit court interprets it, <u>see</u> <u>Abbott Laboratories v. Granite State Ins. Co.</u>, 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the state circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. <u>See</u> <u>Allstate Ins. Co. v. Menards, Inc.</u>, 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the Restatements of Law, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would not necessarily inform a federal court's analysis of federal law -- may validly come into play. The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the <u>Erie</u> analysis to their parent appellate courts when a United States Court of Appeals has declared an interpretation of state law.

 The <u>Erie</u> doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the state jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state

law often become stale.  New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone.  The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree.  In Wankier v. Crown Equipment Corp., the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do.  In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*.  Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.).  From this passage, it seems clear that the Tenth Circuit permits a district court to deviate from its view of state law only on the basis of a subsequent case "of the state's highest court."  The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that").  A more aggressive reading of the passage -- namely the requirement that the intervening case "resolved the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest state court was an oversight or intentional.  Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts.  Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition.  Indeed, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of *Allen* [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

supreme court would do." <u>Wade v. EMCASCO Ins. Co.</u>, 483 F.3d at 666. <u>Accord</u> <u>Mosley v.</u>

<u>Titus</u>, 762 F. Supp. 2d at 1332 (citation omitted); <u>Rimbert v. Eli Lilly & Co.</u>, 577 F. Supp. 2d

1174, 1188-89 (D.N.M. 2008)(Browning, J.)(quoting <u>Wade v. EMCASCO Ins. Co.</u>, 483 F.3d at

665-66). <u>See</u> <u>In re Santa Fe Natural Tobacco Company Marketing & Sales Practices and</u>

<u>Products Liability Litigation</u>, No. MD 16-2695, 2017 WL 6550897, at *27 (D.N.M.

2017)(Browning, J.).

### <u>NEW MEXICO LAW REGARDING BREACH-OF-CONTRACT CLAIMS</u>

A contract is a legally enforceable promise that must consist of an offer, an acceptance,

consideration, and mutual assent. <u>See</u> N.M.R.A., Civ. UJI 13-801. A person may breach a

contract by failing to perform a contractual obligation when the performance is required, unless

that performance is otherwise excused. <u>See</u> N.M.R.A., Civ. UJI 13-822. Incomplete

performance is a breach of contract. <u>See</u> <u>Cochrell v. Hiatt</u>, 97 N.M. 256, 258-59, 638 P.2d 1101,

1103-04 (Ct. App. 1981)(holding that, where the contract called for the roof to be restored to a

"healthy" state and guaranteed the work for twenty-five years, because the roof leaked within the

---

Whether the decision to limit the intervening authority a district court can consider was intentional, the Tenth Circuit has noted it and run with it. In <u>Kokins v. Teleflex, Inc.</u>, the Tenth Circuit, quoting <u>Wankier v. Crown Equipment Corp.</u>, refuses to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law. <u>See</u> <u>Kokins v. Teleflex, Inc.</u>, 621 F.3d 1290, 1297 (10th Cir. 2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided <u>Biosera[, Inc. v. Forma Scientific, Inc.</u>, 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's <u>highest court</u>.'")(emphasis in original)(quoting <u>Wankier v. Crown Equip. Corp.</u>, 353 F.3d at 866).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the <u>Erie</u> doctrine. More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior case law. <u>Moore's</u> lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive." <u>Moore's</u> § 124.22[4] (citing <u>State Farm Mut. Auto. Ins. Co. v. Travelers Indem. Co.</u>, 433 F.2d 311, 312 (10th Cir. 1970)). Nevertheless, the Court must abide by the Tenth Circuit's interpretation of <u>Erie</u>.

twenty-five year period, the defendant's performance was incomplete, and the defendant was in breach of the contract). Under New Mexico law, "[t]he elements of a breach-of-contract action are the existence of the contract, breach of the contract, causation, and damages." Abreu v. N.M. Children, Youth and Families Dep't, 797 F. Supp. 2d 1199, 1247 (D.N.M. 2011)(citing Camino Real Mobile Home Park P'ship v. Wolfe, 119 N.M. 436, 442, 891 P.2d 1190, 1196 (1995)).

> [A] complaint on breach of contract must allege: (1) the existence of a valid and binding contract; (2) the plaintiff's compliance with the contract and his performance of the obligations under it; (3) a general averment of the performance of any condition precedent; and (4) damages suffered as a result of defendant's breach.

McCasland v. Prather, 92 N.M. 192, 194, 585 P.2d 336, 338 (Ct. App. 1978).

Applying these principles in Armijo v. N.M. Dep't of Transp., the Court found that a plaintiffs' allegations failed to state a claim for breach of contract. See No. CIV. 08-0336 JB/ACT, 2009 WL 1329192 (D.N.M. Apr. 6, 2009)(Browning, J.). In support of the breach-of-contract claim, the plaintiff asserted that "the Department would follow state employment policies and procedure, and that the Department terminated him in breach of those policies without just cause." Armijo v. N.M. Dep't of Transp., 2009 WL 1329192, at *7. The Court noted that the plaintiff did not "indicate what contractual provisions or employment policies the Department breached," and did not say "to what his employment contract entitles him or of what the Department deprived him." Armijo v. N.M. Dep't of Transp., 2009 WL 1329192, at *7. The Court found that there was "not enough to determine whether, if taken as true, the Complaint's allegations would support claims for breach of contract." Armijo v. N.M. Dep't of Transp., 2009 WL 1329192, at *8. On the other hand, the Court has previously determined that a pro se plaintiff sufficiently alleged that his counsel breached a contract for legal representation by alleging that his former counsel promised to represent the plaintiff at forfeiture proceedings, that

the plaintiff paid the counsel, and that the counsel failed to represent the plaintiff.  See Archuleta v. City of Roswell, No. CIV 10-1224 JB/RHS, 2012 WL 4950324, at **16-17 (D.N.M. Sept. 30, 2012)(Browning, J.).

Additionally, in spite of the general bar on punitive damages for breach-of-contract cases, the Supreme Court of New Mexico has recognized that punitive damages may be recoverable under some circumstances for a breach of contract.  As the Supreme Court of New Mexico stated in Romero v. Mervyn's, 109 N.M. 249, 784 P.2d 991 (1989): "Our previous cases clearly establish that, in contract cases not involving insurance, punitive damages may be recovered for breach of contract when the defendant's conduct was malicious, fraudulent, oppressive, or committed recklessly with a wanton disregard for the plaintiff's rights."  109 N.M. at 255, 784 P.2d at 998.  Punitive damages are not available when a breaching party's conduct was "solely gross negligence. . . .  In addition to, or in lieu of, such negligence there must be evidence of an 'evil motive' or a 'culpable mental state.'"  Paiz v. State Farm Fire & Cas. Co., 118 N.M. 208, 211, 880 P.2d 300, 308 (1994).  The Supreme Court of New Mexico has defined "reckless disregard" sufficient for an award of punitive damages as "when the defendant knows of potential harm to the interests of the plaintiff but nonetheless utterly fails to exercise care to avoid the harm."  Paiz v. State Farm Fire & Cas. Co., 118 N.M. at 211, 880 P.2d at 308 (secondary quotations and citation omitted).  A defendant does not act with reckless disregard to a plaintiff's rights merely by failing "to exercise even slight care," absent the requisite "culpable or evil state of mind."  Paiz v. State Farm Fire & Cas. Co., 118 N.M. at 211, 880 P.2d at 308 (secondary quotations and citation omitted).  The New Mexico Civil Jury Instructions define the elements necessary for an award of punitive damages for a breach of contract as follows:

> If you find that _____ (*name of party making claim for punitive damages*) should recover compensation for damages, and if you further find that the conduct

of _____ (*name of party whose conduct gives rise to a claim for punitive damages*) was [malicious], [reckless], [wanton], [oppressive], or [fraudulent], then you may award punitive damages.

N.M.R.A., Civ. UJI 13-861.

## NEW MEXICO LAW ON CONTRACT INTERPRETATION
## AND EXTRINSIC EVIDENCE

In C.R. Anthony Co. v. Loretto Mall Partners, 112 N.M. 504, 817 P.2d 238 (1991), the Supreme Court of New Mexico abolished the four-corners standard of contract interpretation, which required a court to determine whether a contract was ambiguous without considering evidence of the circumstances surrounding the contract's negotiation. The Supreme Court of New Mexico held that, "in determining whether a term or expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance." Id. at 508-09, 817 P.2d at 242-43 (footnote omitted). The Supreme Court of New Mexico went on to discuss the parol-evidence rule:

> The parol evidence rule is a rule of substantive law that bars admission of evidence extrinsic to the contract to contradict and perhaps even to supplement the writing. . . . The rule should not bar introduction of evidence to explain terms. As Professor Corbin observes, "No parol evidence that is offered can be said to vary or contradict a writing until by process of interpretation the meaning of the writing is determined." [A.] Corbin, The Parol Evidence Rule, 53 Yale L.J. 603, 622 (1944). The operative question then becomes whether the evidence is offered to contradict the writing or to aid in its interpretation.

C.R. Anthony Co. v. Loretto Mall Partners, 112 N.M. at 509, 817 P.2d at 243 (footnote omitted).

In Mark V, Inc. v. Mellekas ("Mark V"), the Supreme Court of New Mexico made it clear that consideration of extrinsic evidence was not only allowed, but required. See id. at 781, 845 P.2d at 1235 (holding that court committed error when it "relied solely on the face or the 'four corners' of the document"). The Supreme Court of New Mexico summarized the law of

contract interpretation in New Mexico as follows:

> The court may consider collateral evidence of the circumstances surrounding the execution of the agreement in determining whether the language of the agreement is unclear. <u>C.R. Anthony</u>, 112 N.M. at 508-09, 817 P.2d at 242-43. If the evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law. <u>Id.</u> at 510, 817 P.2d at 244. If the court determines that the contract is reasonably and fairly susceptible of different constructions, an ambiguity exists. <u>Vickers v. North Am. Land Dev., Inc.</u>, 94 N.M. 65, 68, 607 P.2d 603, 606 (1980). At that point, if the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact finder . . . .

<u>Mark V,</u> 114 N.M. at 781, 845 P.2d at 1235.

## ANALYSIS

The Court concludes that Ormrod did not breach a contract with KOB 4, because no contract exists. Further, KOB 4 has not properly stated a claim for promissory estoppel, because Ormrod did not make a legally enforceable promise. Accordingly, the Court will grant the Motion.

## I.   ORMROD DID NOT BREACH ANY CONTRACT.

The Court concludes that Ormrod did not breach any contract, because no contract exists. KOB 4 argues that a unilateral contract exists between itself and Ormrod. <u>See</u> Response at 6. According to KOB 4, Ormrod made an offer not to sue KOB 4 in exchange for KOB 4 removing from its website the allegedly defamatory news article, and KOB 4 accepted the offer by removing the relevant language. <u>See</u> Response at 6. Under New Mexico law, a unilateral contract is one "in which the offeror makes a promise in exchange, not for a reciprocal promise by the offeree, but for some performance." <u>Strata Production Co. v. Mercury Exploration Co.</u>, 1996-NMSC-016, ¶14, 916 P.2d 822, 827 ("<u>Strata</u>"). "In a unilateral contract, the offeree accepts the offer by undertaking the requested performance." <u>Strata</u>, 1996-NMSC-016, ¶14, 916

P.2d 822, 827. "Ordinarily, to be legally enforceable, a contract must be factually supported by an offer, an acceptance, consideration, and mutual assent." Hartbarger v. Frank Paxton Co., 1993-NMSC-029, ¶7, 857 P.2d 776, 780.

Here, Ormrod did not make a promise -- an offer -- in exchange for a performance, so the parties never formed a unilateral contract. When Mr. Bregman called KOB 4, he "informed [KOB 4] that [KOB 4] had two options: remove from KOB.com within ten minutes the article containing the statement that Ormrod had been charged, or Ormrod would sue." Counterclaim ¶ 12, at 10. KOB 4 mischaracterizes this statement by arguing that Ormrod "made a promise not to sue KOB-TV if KOB-TV took down from KOB.com within ten minutes of his telephone call the article containing the statement that Ormrod had been charged."[5] Counterclaim ¶ 13, at 10-11. That legal conclusion is at odds with KOB 4's factual allegation describing Ormrod's words, i.e., that Ormrod "informed [KOB 4] that [KOB 4] had two options: remove from KOB.com within ten minutes the article containing the statement that Ormrod had been charged, or Ormrod would sue." Counterclaim ¶ 12, at 10. See Ashcroft v. Iqbal, 556 U.S. at 678 (requiring courts to accept a complaint's factual allegations but not its legal conclusions). KOB 4 paraphrases Ormrod's demand as a conditional statement -- specifically "if you remove the article, then I will not sue you" -- but the correct way to paraphrase Ormrod's demand as a conditional statement is "if you don't remove the article, then I will sue you," which is not logically equivalent to KOB 4's phrasing.

---

[5]The Court must accept as true KOB 4's factual allegation that "Mr. Bregman informed [KOB 4] that [KOB 4] had two options: remove from KOB.com within ten minutes the article containing the statement that Ormrod had been charged, or Ormrod would sue [KOB 4]." Counterclaim ¶ 12, at 10. But whether that statement amounts to a promise not to sue KOB 4 if it removed the article about Ormrod is a legal conclusion, which the Court does not need to accept as true. See Ashcroft v. Iqbal, 556 U.S. at 678.

KOB 4's paraphrasing of Ormrod's demand represents an incorrect contrapositive of Ormrod's actual words. Logicians write conditional statements like "if A, then B" as A→B. "List of valid argument forms," Wikipedia, https://en.wikipedia.org/wiki/List_of_valid_argument_forms (last viewed July 13, 2018). In this case, "A" refers to removing the article, and "B" refers to Ormrod suing KOB 4. "The contrapositive of any true proposition is also true." Mathwords.com, http://www.mathwords.com/c/contrapositive.htm (last viewed July 13, 2018). Creating a contrapositive requires "switching the hypothesis and conclusion of a conditional statement and negating both," Mathwords.com, http://www.mathwords.com/c/contrapositive.htm (last viewed July 13, 2018), which means changing on which side of the arrow the letters A and B are, and then negating both letters. The correct paraphrasing of Ormrod's demand as a conditional statement is "if you don't remove the article, then I will sue you," or ~A→B. The correct contrapositive of Ormrod's statement is thus "if I do not sue you, then you removed the article," or ~B→A, and not "if you remove the article, then I will not sue you," or A → ~B, as KOB 4 alleges.

Indeed, an important distinction exists between saying "if you remove the article, then I will not sue you" -- the incorrect contrapositive -- and saying "if I don't sue, then you removed the article" -- the correct contrapositive. The first statement says that a sufficient condition of not suing is removing the article. The second statement says only that a necessary condition of not suing is removing the article. To illustrate, one could say that, if the Houston Astros won the World Series, then they also won the American League Pennant. Winning the American League Pennant, however, is only a necessary condition of the Astros winning the World Series.

Winning the American League Pennant is not sufficient.  For the Astros to win the World Series, there are other necessary conditions, including winning four games in the World Series.

For these reasons, Ormrod's statement that, if KOB 4 did not remove the article, then he would sue, <u>see</u> Counterclaim ¶ 12, at 10, is not equivalent to saying that Ormrod "made a promise not to sue KOB-TV if KOB-TV took down from KOB.com within ten minutes of his telephone call the article containing the statement that Ormrod had been charged," Counterclaim ¶ 13, at 10-11.  Because Ormrod did not promise not to sue KOB 4 if KOB 4 removed the news article, he did not make an offer for a unilateral contract.  <u>See</u> <u>Strata</u>, 1996-NMSC-016, ¶14, 916 P.2d at 827 (explaining that a unilateral contract is one "in which the offeror makes a promise in exchange, not for a reciprocal promise by the offeree, but for some performance").  Because there is no offer, there is no contract for Ormrod to breach.  <u>See</u> <u>Hartbarger v. Frank Paxton Co.</u>, 1993-NMSC-029, ¶7, 857 P.2d at 780 (holding that, "[o]rdinarily, to be legally enforceable, a contract must be factually supported by an offer"); <u>Resource Associates Grant Writing & Evaluation Services, Inc. v. Southampton Union Free School District</u>, 193 F. Supp. 3d 1200, 1248 (D.N.M. 2016)(Browning, J.)(explaining that, under New Mexico law, a breach-of-contract claim must allege "the existence of a valid and binding contract").[6]

---

[6]At the hearing, discussion occurred regarding the applicability of <u>Mark V,</u> 1993-NMSC-001, 845 P.2d 1232.  <u>See</u> Tr. at 14:6-9 (Court).  <u>Mark V</u> does not, however, apply to this case.  <u>Mark V</u> announced that "we discuss the appropriate methods for a trial court to use in determining whether a contract contains ambiguous terms and in resolving any ambiguities thus discovered." 1993-NMSC-001, ¶ 1, 845 P.2d at 1233.  By its language, <u>Mark V</u> applies to issues of contract <u>interpretation</u>, and not to contract <u>formation</u>.  It explains that "[t]he question whether an agreement contains an ambiguity is a matter of law to be decided by the trial court." 1993-NMSC-001, ¶12, 845 P.2d at 1235.  It continues that, "[o]nce the agreement is found to be ambiguous, the meaning to be assigned the unclear terms is a question of fact." 1993-NMSC-001, ¶13, 845 P.2d at 1235.  Because Ormrod's case concerns contract formation rather than contract interpretation, <u>Mark V</u> is inapplicable.  <u>See</u> <u>Israel v. Glasscock,</u> 616 F. Supp. 2d 1126, 1135 (D.N.M. 2009)(Browning, J.)(noting that in <u>Mark V,</u> the "Supreme Court of New Mexico summarized the law of contract interpretation").

## II. ORMROD DID NOT MAKE A LEGALLY ENFORCEABLE PROMISE.

The Court concludes that Ormrod did not promise not to sue KOB 4, and therefore promissory estoppel does not apply. Under New Mexico law, promissory estoppel makes a promise enforceable when a complainant's reasonable, foreseeable, and substantial reliance on that promise makes its enforcement necessary to prevent injustice. See Strata, 1996-NMSC-016, ¶ 20, 916 P.2d at 828. If there is no promise, however, the doctrine is inapplicable. As explained above, KOB 4's argument that Ormrod "made a promise not to sue" KOB 4 if it removed the news article, Counterclaim ¶ 13, at 10-11, is not consistent with the facts KOB 4 alleges in its Counterclaim, see Counterclaim ¶ 12, at 10. Consequently, because Ormrod did not promise not to sue KOB 4, promissory estoppel is inapplicable.[7] See Richard A. Lord, Williston

---

Additionally, Ormrod argues that KOB 4's "allegation of breach of contract fails to state a claim upon which relief can be granted because it does not state there was any sufficient consideration to establish a contract." Motion at 4. As explained above, KOB 4's characterization of Ormrod's statement as a promise not to sue if KOB 4 removed its news article is incorrect. If, however, Ormrod had made such a promise, valid consideration would exist. "In New Mexico, forbearance may be consideration for a contract where either an express agreement to forbear exists or where the circumstances otherwise suggest that a contract ought to be enforced by implying such an agreement." Spray v. City of Albuquerque, 1980-NMSC-028, ¶ 8, 608 P.2d 511, 512-13. Accordingly, if Ormrod had said that he promised not to sue KOB 4 if it removed its news article, then an express agreement to forbear -- and thus adequate consideration -- would exist.

[7]Even if Ormrod had made a promise, promissory estoppel would not render that promise legally enforceable, because failing to enforce it would not cause injustice. See Strata, 1996-NMSC-016, ¶ 20, 916 P.2d at 828. After speaking with Mr. Bregman, KOB 4 "at approximately 4:02 PM . . . updated the article to remove the 'charged' language, and at approximately 4:08 PM . . . removed Ormrod's name from the article." Counterclaim ¶ 14, at 11. KOB 4 also added an editor's note stating "'[t]he name of the teacher being investigated has been removed as he does not currently face charges. APS has since clarified that there is only an investigation at this point. A letter home to parents named the teacher involved.'" Counterclaim ¶ 14, at 11 (quoting Article at 3, filed April 30, 2018 (Doc. 66-6)). KOB 4's decision to edit its article and remove Ormrod's name should help -- and not hurt -- KOB 4 by mitigating its damages should Ormrod's defamation claim succeed. KOB 4's actions in response to Mr. Bregman's call did not cause injustice. See Tr. at 25:10-13 (Court)("I'm not seeing the injustice to channel 4. If anything, it mitigated damages here by getting . . . the demand from an attorney and then acting on it.").

on Contracts § 8:4, at 95 (4th ed. 2008)("The binding thread in all the classes of [promissory estoppel] cases is the justifiable reliance of the <u>promisee</u> and the hardship involved in refusal to enforce the <u>promise</u>.")(emphases added).

**IT IS ORDERED** that the Motion to Dismiss Defendant KOB-TV, LLC's Counterclaim for Promissory Estoppel and Breach of Contract, filed May 21, 2018 (Doc. 77), is granted. Defendant KOB-TV, LLC's claims for breach of contract and promissory estoppel in KOB-TV, LLC's Answer, Defenses, and Counterclaim, filed April 30, 2018 (Doc. 66), are dismissed with prejudice.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Sam Bregman
The Bregman Law Firm, P.C.
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Zachary R. Cormier
Geoffrey D. Rieder
Keleher & McLeod, P.A.
Albuquerque, New Mexico

-- and --

Meghan Dimond Stanford
Jackson Loman Stanford & Downey, P.C.
Albuquerque, New Mexico

-- and --

Travis G. Jackson
Foster, Rieder & Jackson, P.C.
Albuquerque, New Mexico

    *Attorneys for Defendant Hubbard Broadcasting, Inc.*

Patrick J. Rogers
Patrick J. Rogers, L.L.C.
Albuquerque, New Mexico

-- and --

Zachary R. Cormier
Geoffrey D. Rieder
Keleher & McLeod, P.A.
Albuquerque, New Mexico

-- and --

Gregg D. Thomas
Jon M. Philipson
Thomas & LoCicero P.L.
Tampa, Florida

*Attorneys for Defendant KOB-TV, LLC*